**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| MARY LOU WEISS, | : | |
| *Plaintiff*, | : | |
| | : | CIVIL ACTION |
| v. | : | NO. 18-3118 |
| | : | |
| THE PENNSYLVANIA HOSPITAL OF | : | |
| THE UNIVERSITY OF PENNSYLVANIA | : | |
| D/B/A PENNSYLVANIA HOSPITAL; THE | : | |
| TRUSTEES OF THE UNIVERSITY OF | : | |
| PENNSYLVANIA D/B/A HOSPTIAL OF | : | |
| THE UNIVERSITY OF PENNSYLVANIA, | : | |
| *Defendants*. | : | |

**MEMORANDUM**

JONES, II   J.                                                   February 26, 2021

## I.     INTRODUCTION

Ms. Mary Lou Weiss's ("Plaintiff") employment with The Pennsylvania Hospital ("Defendants") ended when, due to illness, she could no longer work as an echocardiographic technician ("echo tech") in the Hospital setting.  Plaintiff initiated this action against Defendants, alleging disability discrimination based on a failure to accommodate theory and retaliation in violation of the Americans with Disabilities Act ("ADA"), the Pennsylvania Human Relations Act ("PHRA"), and the Philadelphia Fair Practices Ordinance ("PFPO").  Defendants have moved for Summary Judgment on all of Plaintiff's claims and further argue that Plaintiff is not entitled to recover punitive damages.  Additionally, Defendants have moved to strike Plaintiff's affidavit as a sham affidavit.  For the reasons outlined below, Defendants' Motion for Summary Judgment [hereinafter Motion] (ECF No. 46) is denied in part and granted in part, and Defendants' Motion to Strike (ECF No. 51) is denied.

II.     **STATEMENT OF FACTS**

The facts interpreted in the light most favorable to Plaintiff[1] establish the following.

Plaintiff was employed by Defendants[2] as an echo tech from March 1, 2013 until October 27,

2017. SUF ¶ 3; RSUF ¶ 3.  When Plaintiff's employment began, her supervisor was

Christopher Cain.  SUF ¶ 5; RSUF ¶ 5.  Mr. Cain continued to be the person Plaintiff directly

reported to throughout her entire employment, even when Elpidio Sandig was hired to oversee

the echo tech department in March of 2017.  SUF ¶ 5; RSUF ¶ 5.  Mr. Sandig's supervisor was

Danielle Heffner, the Director of Heart and Vascular Services.  SUF ¶ 6; RSUF ¶ 6.

During Plaintiff's employment with Defendants, echo studies were performed by her

department in four different locations: the outpatient services office ("Outpatient"),

Pennsylvania Hospital (the "Hospital"), an office at 800 Walnut Street, and a long-term care

facility.  SUF ¶ 11; RSUF ¶ 11.  Plaintiff was only ever scheduled to work in the Hospital or

in Outpatient.  SUF ¶ 11; RSUF ¶ 11.  Between January 1, 2014 through October 2017,

Plaintiff's time records show she was scheduled to work in Outpatient Monday through

Fridays during normal business hours and worked limited on-call shifts at the Hospital.  CMF

¶¶ 37-39.

As of Plaintiff's last day of employment, Plaintiff was one of five full-time echo techs.

SUF ¶ 8; RSUF ¶ 8.  Given this small number, to cover staffing shortages, Defendants utilized

---

[1] For purposes of this discussion, this Court shall refer to Defendant's Statement of Undisputed Facts (ECF No. 46-1) as "SUF," Plaintiff's Response thereto (ECF No. 47-2) as "RSUF," Plaintiff's Counterstatement of Material and Disputed Facts (ECF No. 47-1) as "CMF."
[2] When Plaintiff first joined the Hospital in 2011, her employer was Pennsylvania Cardiology Associates ("PCA").  In 2013, PCA was acquired by Pennsylvania Hospital and named Penn Cardiology.  Plaintiff worked in the Clinical Practices of the University of Pennsylvania ("CPUP"), and all employees from PCA, including echo techs, were made the University of Pennsylvania Hospital employees.  CMF ¶¶ 4-5.

staffing agencies for Outpatient coverage because agency echo techs were not trained to work in the Hospital.  SUF ¶¶ 23-24; RSUF ¶¶ 23-24.

The written job description of an echo tech listed on an employment evaluation requires the ability to continuously lift, push, and pull over fifty (50) pounds.  SUF ¶ 25; RSUF ¶ 25. This job requirement exists for a number of reasons, including: (1) helping patients get on and off the table; (2) using additional force to get a proper reading when conducting an echo study on a larger patient; and (3) when working at the Hospital, so the echo tech may move the echo machine around to patients.  SUF ¶ 26; RSUF ¶ 26.  Within the Hospital, echo studies are performed at various locations, including: bedside in the emergency room, bedside in the intensive care unit ("ICU"), bedside in the catheter lab, bedside on any floor in the Hospital, and, if the patient is well enough, in the heart station.  SUF ¶ 27; RSUF ¶ 27.  The frequency with which an echo tech is required to push an echo machine in the Hospital can vary depending on the number of patients, the patient's mobility, the number of critical care patients, and the number of other echo techs present in the Hospital.  SUF ¶ 28, RSUF ¶ 28.

Unlike shifts in the Hospital, echo techs do not need to push the echo machine around when working in Outpatient because patients come directly to the technician.  CMF ¶ 16.  Even if an echo tech works all of her primary shifts in Outpatient, all echo techs still work at least some on-call shifts at the Hospital outside of "normal" work hours and on weekends.  SUF ¶¶ 13-16; RSUF ¶¶ 13-16.

### A.    Plaintiff's Medical Accommodations in April of 2017

Due to Plaintiff's health issues, throughout her employment, Plaintiff requested, and Defendants provided, a variety of work accommodations.  SUF ¶ 29; RSUF ¶ 29.  The accommodations at issue were the ones requested when Plaintiff was diagnosed with L3-L4 neuropathy on or about April 17, 2017.  SUF ¶ 34; RSUF ¶ 34.  From the neuropathy, Plaintiff

suffered lower back pain and numbness in her right leg.  SUF ¶ 35; RSUF ¶ 35.  Because of her condition, on or about April 24, 2017, Plaintiff requested a continuous leave of absence; Defendants granted Plaintiff's request and provided her with twelve weeks of FMLA leave from April 18, 2017 through July 10, 2017 and then "other medical leave," pursuant to Defendants' policy, until July 18, 2017.  SUF ¶¶ 36-37; RSUF ¶¶ 36-37.  During Plaintiff's leave, her colleagues covered her call schedule, and agency staff helped cover her shifts in Outpatient.  SUF ¶ 38; RSUF ¶ 38.

Plaintiff returned to work on July 19, 2017 with her completed Certification of Return to Work.  SUF ¶ 40; RSUF ¶ 40.  The Certification of Return to Work listed Plaintiff's restrictions to no heavy lifting or pushing (without specifying a weight limit or the frequency of the weight restriction), working in areas that have adjustable beds, and having the capacity to sit during procedures for six (6) months.  SUF ¶ 43; RSUF ¶ 43.  When Defendants requested a specific weight restriction, Plaintiff's provider submitted an updated return to work certification that limited Plaintiff's lifting and pushing ability to no more than five (5) pounds, but Defendants informed Plaintiff that they would not be able to accommodate this weight restriction with any patient-care position.  SUF ¶¶ 44-45; RSUF ¶¶ 44-45.  Plaintiff returned to her physician once more and provided an updated Certification of Return to Work with a weight limit of up to fifty (50) pounds.  SUF ¶ 46; RSUF ¶ 46.

With this information, Danielle Parks, the Human Resources Performances Management and Retention specialist who was working on Plaintiff's leave and accommodation request, drafted a letter to Plaintiff dated July 27, 2017, saying that Plaintiff's accommodations would be granted for the requested six (6) month duration.  SUF ¶ 47; RSUF ¶ 47.  However, Ms. Parks did not send Plaintiff this letter and, instead, had email discussions with the echo tech

Department Supervisor, Mr. Sandig, Plaintiff's direct supervisor, Mr. Cain, and the Director of Heart and Vascular Services, Ms. Heffner, about the potential to accommodate Plaintiff's request.  SUF ¶ 47; RSUF ¶ 47.  Defendants were concerned about Plaintiff's ability to work in the Hospital and take call because the manufacturers of the echo machine verified that the force needed to move the machine was fifty-five (55) pounds.  SUF ¶¶ 48-49; RSUF ¶¶ 48-49.

The echo tech department considered other alternatives to assist Plaintiff, such as having a transport person assist with moving the echo machine, but, because of staffing limitations, this idea was dismissed.  SUF ¶¶ 50-51; RSUF ¶¶ 50-51.  Defendants determined they could only accommodate Plaintiff for two (2) of the requested six (6) months.  SUF ¶ 52; RSUF ¶ 52.  On August 17, 2017, Ms. Parks sent Plaintiff a letter detailing this restriction and further stating,

> We are willing to offer you the requested reasonable accommodation, however the department cannot accommodate the requested duration of 6 months.  As to not pose an undue hardship to the department, we are willing to offer you the requested accommodation through 9/20/17.  If further accommodations are needed after 9/20/17, we ask that you provide updated physician documentation regarding your work status by that date.  In conjunction with the Disability Management Department and Human Resources, we will then re-evaluate your requests for reasonable accommodation.

SUF ¶ 53; RSUF ¶ 53.

While Defendants worked on her accommodation request, Plaintiff was having a hard time re-adjusting to work.  SUF ¶ 54; RSUF ¶ 54.  The larger a patient was, the more pain Plaintiff experienced because she had to use greater pressure when conducting an echo study.  SUF ¶ 55; RSUF ¶ 55.  Even with the agreed upon accommodations, Plaintiff exacerbated her medical condition while examining a larger patient in Outpatient around August 17, 2017 and requested further medical leave.  SUF ¶ 56; RSUF ¶ 56.  Even though Plaintiff had exhausted all her FMLA leave, Defendants granted her additional leave.  SUF ¶ 57; RSUF ¶ 57.

### B. Plaintiff's Medical Accommodations for October of 2017

In preparation for her return to work from this additional leave, Plaintiff's healthcare provider submitted a Return to Work Certification in October of 2017 where he requested the following accommodations: (1) no pushing or pulling more than 50 pounds; (2) sitting while doing procedures; and (3) Plaintiff using adjustable beds. SUF ¶¶ 58-60; RSUF ¶¶ 58-60. When Ms. Parks relayed these restrictions to Ms. Heffner in an email, Ms. Heffner responded within four (4) minutes, saying that "[t]hese restrictions will create an undue burden and do not allow her to perform the duties of the position description." Emails Regarding Plaintiff's October Return to Work, Attached to Plaintiff's Response in Opposition as Exhibit 5[3] [hereinafter Ex. 5]. Despite this email, Ms. Heffner did not immediately deny Plaintiff's request but began communications with Mr. Sandig about his thoughts on the department's ability to accommodate. Ex. 5. Mr. Sandig and Ms. Heffner followed up with Plaintiff's doctor to determine that the requested accommodations would be for six (6) months. SUF ¶ 60; RSUF ¶ 60.

Ms. Parks communicated to Plaintiff both by phone and in writing about these restrictions, explaining that while Defendants could accommodate Plaintiff's request for adjustable beds and to sit while performing procedures, they would not be able to accommodate Plaintiff's lifting and pulling restriction at fifty (50) pounds because it requires fifty-five (55) pounds of force to start moving the echo machine. SUF ¶ 66; RSUF ¶ 66. Ms. Parks recommended Plaintiff return to her healthcare provider and inquire about increasing her weight restriction to fifty-five (55) pounds so she could move the echo machine. SUF ¶ 68;

[3] In addition to multiple exhibits labeled from letter A to ZZ, Plaintiff submitted seventeen (17) exhibits labeled 1-17. The Court will maintain the parties' labeling despite this including both numerically and alphabetically labeled exhibits.

RSUF ¶ 68. Plaintiff did not return to ask him to reconsider his prior medical recommendations.  SUF ¶ 69; RSUF ¶ 69.  Plaintiff asserts she did not ask her doctor to reconsider because they had already had multiple conversations about her job expectations, and her doctor did not think it was in her best interest to take call.  CMF ¶ 71.  Plaintiff further states that both Mr. Sandig and Ms. Parks told her on two (2) occasions that she must return to work without restrictions or would have to resign from the position.  CMF ¶ 94.

With these concerns in mind, Plaintiff sent Ms. Parks an email saying she did not want to resign and requested that she only work in Outpatient with a limited on-call schedule, as she had been for the first six years of her employment with Defendants; Ms. Parks responded reiterating the need to take call and work in the Hospital.  SUF ¶ 70; RSUF ¶ 70.  As of October 27, 2017, Defendants had not approved Plaintiff's request to work solely in Outpatient, and Plaintiff did not return to work.  SUF ¶ 76; RSUF ¶ 76.  Defendants considered Plaintiff as having voluntarily resigned from the position, and Plaintiff's employment was officially terminated.  SUF ¶ 76; RSUF ¶ 76.

Plaintiff initiated the present action by filing a Complaint against Defendants on July 25, 2017.  ECF No. 1.  Defendants filed an Answer on September 24, 2018.  ECF No. 5.  Plaintiff later filed her final Amended Complaint on November 30, 2018.  ECF No. 13.  Defendants submitted an Answer to the Amended Complaint on December 14, 2018.  ECF No. 15.  Upon completion of fact discovery, Defendants filed the present Motion for Summary Judgment on July 18, 2019.  ECF No. 46.  Plaintiff submitted a Response in Opposition thereto on August 1, 2019.  ECF No. 47. On August 8, 2019, Defendants submitted a Reply in support of their Statement of Undisputed Facts and a Reply in Opposition to Plaintiff's Counterstatement of Material and Disputed Facts. ECF No. 49, 50.

On August 8, 2019, Defendants filed a Motion to Strike Plaintiff's Affidavit as a sham affidavit that contradicted Plaintiff's prior deposition testimony from both this case and a separate workman's compensation claim.  ECF No. 51.  Plaintiff filed her Response in Opposition to Defendants' Motion on August 23, 2019, stating that her affidavit does not contradict the deposition testimony but provides further explanation to her answers and to questions not asked. ECF No. 52.  In response to Plaintiff's Opposition, Defendants submitted a Reply in Further Support of their Motion to Strike on September 3, 2019.  ECF No. 55.  Defendants' Motion for Summary Judgment and Motion to Strike are ripe for this Court's consideration.

## III.    SUMMARY JUDGMENT STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), a court shall grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine [dispute] as to any material fact and that the moving party is entitled to a summary judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(a).  "If the moving party meets its burden, the burden shifts to the nonmoving party to go beyond the pleadings and come forward with specific facts showing that there is a genuine issue for trial." *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (internal citations and quotation marks omitted).  Therefore, in order to defeat a motion for summary judgment, the non-movant must establish that the disputes are both: (1) material, meaning concerning facts that will affect the outcome of the issue under substantive law; and (2) genuine, meaning the evidence must be such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 248 (1986).

"Although the initial burden is on the summary judgment movant to show the absence of a genuine issue of material fact, 'the burden on the moving party may be discharged by "showing"—that is, pointing out to the district court—that there is an absence of evidence to

support the nonmoving party's case' when the nonmoving party bears the ultimate burden of proof." *Singletary v. Pa. Dep't of Corr.*, 266 F.3d 186,193 (3d Cir. 2001) (quoting *Celotex*, 477 U.S. at 325). "[A] nonmoving party must adduce more than a mere scintilla of evidence in its favor and cannot simply reassert factually unsupported allegations contained in its pleadings[.]" *Williams v. West Chester*, 891 F.2d 458, 460 (3d Cir. 1989) (citation omitted).

Accordingly, summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. To that end, however, "conclusory, self-serving affidavits are insufficient to withstand a motion for summary judgment." *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 161 (3d Cir. 2009) (quoting *Blair v. Scott Specialty Gases*, 283 F.3d 595, 608 (3d Cir. 2002)) (internal quotation marks omitted). Instead, an affiant must set forth specific facts that reveal a genuine issue of material fact. *Id*. A plaintiff's reliance on her own testimony, without further evidence, is insufficient to establish a material issue of fact and overcome a motion for summary judgment. *See Solomon v. Soc'y of Auto. Eng'rs.*, 41 Fed. App'x 585, 586 (3d. Cir. 2002) (Determining evidence that is solely Plaintiff's own testimony is insufficient to survive a claim of summary judgment); *Fusco v. Bucks County*, No. 08-2082, 2009 WL 4911938, at *11 (E.D. Pa. Dec. 21, 2009); (Granting summary judgment where, even after discovery, "Plaintiff offers no support, beyond her own testimony, to corroborate her claims.").

A court must "view the facts and any reasonable inferences drawn therefrom in the light most favorable to the party opposing summary judgment." *InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 160 (3d Cir. 2003). However, if a party fails to properly address another party's assertion of fact, a court may consider the fact undisputed and grant summary judgment. *See* Fed. R. Civ.

P. 56(3)(2)-(3); *see also Judge C. Darnell Jones II Chambers Policies and Procedures* (rev'd Oct. 29, 2020) http://www.paed.uscourts.gov/documents/procedures/jonpol.pdf ("The Court will not consider any description of a fact that is not supported by citation to the record.  Statements of Material Facts in support of or in opposition to a motion for summary judgment must include specific and not general references to the parts of the record that support each of the statements, such as the title of or numbered reference to a document, the name of a deponent and the page(s) of the deponent's deposition, or the identity of an affidavit or declaration and the specific paragraph relied upon.  Pinpoint citations are required.").

In employment discrimination cases, the summary judgment standard "is applied with added rigor...[because] intent and credibility are crucial issues." *Stewart v. Rutgers, The State Univ.*, 120 F.3d 426, 431 (3d Cir. 1997) (internal quotation marks omitted).  The Third Circuit has found that "summary judgment is...rarely appropriate in this type of case." *Marzano v. Computer Sci. Corp. Inc.*, 91 F.3d 497, 509 (3d Cir. 1996).  "Simply by pointing to evidence which calls into question the defendant's intent, the plaintiff raises an issue of material fact which, if genuine, is sufficient to preclude summary judgment." *Id*. at 509-510 (internal quotation marks omitted).

## IV.    DISCUSSION

### A.  Defendants' Motion for Summary Judgment

Defendants have moved for summary judgment, specifically asking this Court to declare that Plaintiff: (1) was not qualified to perform the essential functions of her job as an echo tech; (2) insisted on an unreasonable accommodation by solely requesting that she solely be scheduled to work in Outpatient for six months; and (3) refused to engage with Defendants in the interactive process to determine a reasonable accommodation for her to return to work.  Mot. 2.  Defendants also ask this Court to find that Plaintiff's retaliation claim is invalid for being a reiteration of her

discrimination claim and that she be prevented from recovering punitive damages.  *Id*. at 16, 25-26.  For the reasons stated herein, Defendants' Motion is denied in part and granted in part.

### B.  Plaintiff's Disability Discrimination Claims Under the ADA, PHRA, or PFPO

The ADA prohibits an employer from "discriminat[ing] against a qualified individual on the basis of disability in regard to...discharg[ing] employees...and other terms, conditions, and privileges of employment."  42 U.S.C. §12112(a).  Plaintiff's claim of disability discrimination is governed by the three-part burden shifting analysis set forth in *McDonnell Douglas Corporation v. Green*.  The first prong of the three-part analysis is to determine whether Plaintiff has met her initial burden to establish a prima facie case of discrimination.  *Dorsey v. Pittsburgh Assocs.*, 90 Fed. App'x 636, 639 (3d Cir. 2004).  If Plaintiff establishes a prima facie case, the burden shifts to Defendants to articulate some non-discriminatory reason for its action.  *McDonnell Douglas*, 411 U.S. at 802.  If Defendants succeed, the burden shifts back to Plaintiff to show that the employer's stated reason was a pretext for intentional discrimination.  *Id.* at 804.

### 1.  Plaintiff's Prima Facie Case

Plaintiff bases her disability discrimination claim on a failure to accommodate theory. "'Discrimination under the ADA...includes failing to make reasonable accommodations for a plaintiff's disabilities.'"  *Serine v. Marshall*, No. 14-4868, 2015 WL 803108, at *3 (E.D. Pa. Feb. 2015) (quoting *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 (3d Cir. 1999).  To establish a prima facie case, Plaintiff must show: "(1) she is a disabled person within the meaning of the [ADA]; (2) she is otherwise qualified to perform the essential functions of the job with or without reasonable accommodations by the employer; and (3) she has suffered an otherwise adverse employment decision as a result of discrimination."  *Thimons v. PNC Bank, N.A.*, 254 Fed. App'x 896, 897 (3d Cir. 2007) (citations omitted).  "In the context of the ADA, an adverse employment action includes an employer's failure to make 'reasonable efforts to assist the employee and to

communicate with the employee in good faith, under what has been termed a duty to engage in the interactive process [to provide her a reasonable accommodation.]'" *Willis v. Norristown Area Sch. Dist.*, 2 F. Supp. 3d 597, 606 (E.D. Pa. 2014) (quoting *Williams v. Phil. Hous. Auth. Police Dep't*, 380 F.3d 751, 561 (3d Cir. 2004) (citation omitted). For purposes of their Summary Judgment Motion, Defendants do not contest that Plaintiff suffered from a disability. However, Defendants assert that Plaintiff has failed to establish that she is qualified to perform the essential functions of her echo tech job and proposed an unreasonable accommodation as a matter of law, so she has failed to establish a claim of disability discrimination. Alternatively, Defendants argue that even if Plaintiff shows herself as qualified to perform the job of an echo tech, she failed to engage in the interactive process and is precluded from bringing her discrimination claim. In rebuttal, Plaintiff notes there are still disputed material facts surrounding her prima facie case, so granting summary judgment at this stage would be inappropriate. For the reasons stated herein, the Court agrees with Plaintiff.

### a) Being a Qualified Individual

To have a successful prima facie case of disability discrimination, retaliation, or failure to accommodate under the ADA, Plaintiff must establish that she is a "qualified individual," defined as a person "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C §12111(8). "This inquiry has two parts: '(1) whether the individual has the requisite skill, experience, education and other job-related requirements of the position sought, and (2) whether the individual, with or without reasonable accommodation, can perform the essential functions of that position.'" *Supinski v. UPS*, 413 Fed. Appx. 536, 540 (3d Cir. 2011) (quoting *Turner v. Hershey Chocolate USA*, 440 F.3d 604, 611 (3d Cir. 2006).

Both Plaintiff and Defendants agree that Plaintiff has met the first part of this inquiry and has the necessary skill, experience, and education to perform the job of an echo tech. Accordingly, this Court's analysis will focus on whether Plaintiff was capable of performing the essential functions of her job. More specifically, the first question this Court must address is if there are any materially disputed facts surrounding whether working in the Hospital or taking call is an essential function of being an echo tech. If Plaintiff cannot show that she could perform the essential functions of her job with or without reasonable accommodation at the time of termination, her prima facie case fails. *Garner v. School District of Philadelphia*, 63 F. Supp. 3d 483, 489-490 (E.D. Pa. Oct. 24, 2014); *Barclay v. Amtrak*, 435 F. Supp. 2d 438, 445 (E.D. Pa. June 20, 2006).

"Whether a particular function is essential 'is a factual determination that must be made on a case-by-case basis [based upon] *all* relevant evidence. *Deane v. Pocono Med. Ctr.*, 142 F.3d 138, 148 (3d Cir. 1998) (quoting 29 C.F.R. pt. 1639, app. §1630.2(n)). The "essential functions" of a position are the "fundamental job duties," not "marginal functions." 29 C.F.R. §1630.2(n)(1). "A job function may be considered essential for a number of reasons, including because[:] (1) 'the reason the position exists is to perform that function,' (2) only a limited number of employees are available 'among whom the performance of that job function can be distributed,' or (3) the function is 'highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function.'" *Supinski*, 413 Fed. Appx. at 540 (quoting 29 C.F.R. §1630.2(n)(1)).

The Third Circuit has established that Plaintiff has the burden of establishing that she is a qualified individual, and the employer has the burden of showing a particular job function is an essential function. *Supinski*, 413 Fed. Appx., at 540. Generally, Courts grant a "significant degree of deference to an employer's determination as to what functions are essential."

Americans with Disabilities: Practice & Compliance Manual § 7:108 (2020).  Though Courts should not question an employer's business judgment, the employer's good-faith view of what a job entails is not dispositive, and Courts should also consider evidence of the employer's actual practices in the workplace.  *Id*.  Courts must "consider the position for which an employee was hired and not a more limited position that the employee actually performed."  *Id*.  Viewing the facts in the light most favorable to the Plaintiff, this Court cannot conclusively determine whether working in the Hospital, particularly working shifts on-call, was an essential function of being an echo tech.

In accord with 42 U.S.C. §12111(8), this Court will first turn to the echo tech's written job description.  Though both parties provide the court with a written job description attached to an echo tech performance evaluation, neither party offers the position description Plaintiff was shown when she started her job.  *See* Echo Tech Job Description, Attached to Plaintiff's Dep. (Attached to Plaintiff's Response in Opposition as Exhibit A [hereinafter Ex.A]) as Ex. 5.  The provided job description of an echo tech notes the ability to continuously lift, push, and pull over fifty (50) pounds but does not mention working in the Hospital or on-call.  SUF ¶ 25; RSUF ¶ 25.  While the weight restriction exists to assist patients in getting on and off the table for an echo reading and to use additional force when getting a proper reading, it also assures echo techs can move the echo machine around to patients' rooms when working in the Hospital.  SUF ¶ 26; RSUF ¶ 26.  Rolling the machine around requires fifty-five (55) pounds of force.  SUF ¶ 66; RSUF ¶ 66.  So, any echo tech scheduled to work in the Hospital, including shifts on-call, must be able to push at least fifty-five (55) pounds.

Even if an echo tech may be scheduled primarily in Outpatient, Defendants assert that working on-call shifts in the Hospital is an essential function of the position, so all echo techs

must be able to push at least fifty-five (55) pound.  Mot. 8-9.  Plaintiff rebuts that taking call is a

marginal, not essential, function of her job.  Pl's Response in Opposition, ECF No. 47, 19.  To

support this, Plaintiff states that she had gone months without having an on-call shift, even

before she had made any medical accommodation requests.  *Id*. at 17.

The Court finds that Plaintiff has demonstrated sufficient evidence to show that working

shifts in the Hospital, particularly working on-call, is not an essential function of an echo tech

position.  Most persuasively, Defendants were willing and able to accommodate Plaintiff's fifty

(50) pound lifting restriction for a period of at least two (2) months, with the potential to be

accommodated up to six (6) months, pending provider updates.  SUF ¶ 53; RSUF ¶ 53.  If

Defendants were able to accommodate Plaintiff's request, even for just two (2) months, it raises

doubt that the ability to lift, push, or pull fifty-five (55) is essential to the job of an echo tech.

Though Plaintiff has presented evidence sufficient to avoid summary judgment, the Court

recognizes the strength of Defendants' arguments.  In her deposition, Plaintiff admits she was

scheduled to work shifts on-call in the Hospital "once or twice per month."  Ex. A 95:11-12.

Plaintiff's sentiment was similarly recounted by other echo techs who explained that working on-

call in the Hospital at least some weekends was expected, especially given the small number of

echo techs available to work shifts on-call.  *See* Deposition of echo tech Thomas McKee,

Attached to Def's Mot. for Summary Judgment as Ex. N [hereinafter Ex. N] 29:15-22.

Even with Defendants' evidence, the Third Circuit has historically advised District

Courts against making these highly factual determinations that should be left to a jury.  *See*

*Turner*, 440 F.3d at 612 (Declining to define an essential function where the plaintiff presented

sufficient evidence to support a reasonable jury finding that rotation was not an essential function

of being a shaker table inspector); *Skerski v. Time Warner Cable Co.*, 257 F.3d 273, 280 (3d Cir.

2001) (Reversing a District Court's determination that climbing was an essential function of a cable installer technician's job because the definition of essential function set forth in 29 C.F.R. § 1630.2(n)(1), as well as the non-exhaustive list of probative evidence set forth in 29 C.F.R. § 1630.2(n)(3), caution against any premature determination of an essential function); *Deane*, 142 F.3d at 148 (Leaving the question of whether lifting heavy objects was an essential function of a nurse's job to the jury, despite recognizing the intuitive appeal of the hospital's argument).

So, too, here, the issue should be decided by a jury.  Plaintiff has presented evidence to support a reasonable jury finding that working shifts on-call in the Hospital is not an essential function of being an echo tech.  Thus, she has made a sufficient showing that she was qualified to perform her job as an echo tech at the time of her termination.

### b)  Reasonable Accommodations

For the second prong of establishing a prima facie case of disability discrimination, Plaintiff must demonstrate that she was able to perform the essential functions of her position with or without reasonable accommodation.  Defendants argue that, even if working in the Hospital and taking call is not an essential function of Plaintiff's position, Defendants are still entitled to summary judgment because Plaintiff's request to work entirely in Outpatient and take a limited on-call schedule is not a reasonable accommodation.  Mot. 17.  Plaintiff argues the contrary.  Plaintiff's Response in Opposition 11.  For purposes of defeating summary judgment, there are still disputed material facts as to whether Plaintiff's requested accommodations would reasonably allow her to perform the essential functions of her position.

A reasonable accommodation may include, "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices,...and other similar accommodations for individuals with disabilities."  42 U.S.C. §

12111(9).  However, the employer's duty to provide a reasonable accommodation is not limitless.  "An employee can succeed under [the ADA] only if the employee can 'demonstrate that a specific, reasonable accommodation would have allowed her to perform the essential functions of her job.'  Thus, employers are not required to modify the essential functions of a job in order to accommodate an employee...[An employer] is not required to hire any employees who cannot perform an essential duty of the job."  *Donahue v. CONRAIL*, 224 F.3d 226, 232 (3d Cir. 2000).

The Third Circuit has held, "[a]s with the issue of 'essential function,' the issue of 'reasonable accommodation' presents a fact question."  *Turner*, 440 F.3d at 614.  To determine whether a genuine issue of material fact exists, the Court must first determine whether Plaintiff has made a facial showing that her requested accommodation is possible.  *Gaul v. Lucent Technologies, Inc.*, 134. F.3d 576, 580 (3d Cir. 1998).  If Plaintiff meets this expectation, "[Defendants] then bear[] the burden of proving, as an affirmative defense, that the accommodations requested by the plaintiff are unreasonable, or would case an undue hardship on the employer."  *Shiring v. Runyon*, 90 F.3d 827, 831 (3d Cir. 1996).

Viewing the facts in the light most favorable to Plaintiff, this Court finds that Plaintiff has met this initial burden.  Considering she worked almost exclusively in Outpatient for years, besides her shifts on-call, it remains unclear why Defendants would no longer be able to accommodate Plaintiff for the requested six (6)-month duration.  With regards to Plaintiff's shifts on-call, though Plaintiff acknowledges her inability to work these shifts and believes that she "would have only missed taking weekend call a *maximum* of three (3) times," she further contends that there were multiple times during her employment where either herself or her five other colleagues missed on-call shifts "for vacations, leaves, call outs and the like."  Plaintiff's

Response in Opposition 12.  Other echo techs similarly noted how they would cover shifts for each other when necessary.  *See* Ex. N 30:1-11; Deposition of Pamela Phayre, Attached to Defendants' Motion for Summary Judgment as Exhibit F [hereinafter Ex. F] 38:13-22.  Given this information, Plaintiff has presented sufficient evidence to suggest that her requested accommodation was reasonable.

Having met this initial threshold, the burden then shifts to Defendants to demonstrate that this accommodation is unreasonable or would cause an undue hardship.  Defendants claim that Plaintiff's request to work entirely in Outpatient and to take a limited on-call rotation is unreasonable because it would require Defendants eliminate an essential function of Plaintiff's echo tech position.  Mot. 17.  *See Lombardo v. Air Prod & Chemicals, Inc.*, No. 05-1120, 2006 WL 1892677, at *12 (E.D. Pa. July 7, 2006) ("Eliminating…[essential] tasks or reassigning them to other employees [is] not required as a 'reasonable accommodation' under the ADA.").  However, given that the record is not clearly developed to define working in the Hospital as an essential function, Defendants' argument cannot be decided at this phase of litigation.

Alternatively, Defendants suggest that Plaintiff's request to be exempt from call for six (6) months would place an undue burden on the echo tech department.  Because Defendants cannot use a staffing agency to fill shifts on-call at the Hospital where the agency staff are not trained to work, Defendants claim Plaintiff's requested accommodation would force other echo techs to "work outside of business hours more often and in a more physically taxing situation." Mot. 20.  However, viewing the facts in the light most favorable to Plaintiff, this Court cannot conclude this to be true.  As stated previously, it is commonplace for echo techs to cover each other's on-call shifts when necessary.  Additionally, just because Plaintiff would not be able to work her shifts on-call during the requested six (6) month period, there is nothing in the record to

indicate that she would not have been able take extra on-call shifts after returning to her normal schedule.  This Court cannot conclude as a matter of law that granting Plaintiff's accommodation would pose an undue hardship on Defendants.  Accordingly, deciding whether Plaintiff can perform the essential functions of her echo tech position with reasonable accommodation is an open question of material fact that must be decided by a jury.

### c)  The Interactive Process

As the third prong of Plaintiff's prima facie, Plaintiff must present evidence that Defendants failed in making a good faith effort to accommodate her.  "To allege an adverse employment action through a failure to accommodate [claim, Plaintiff] must [show]: (1) [Defendants] knew about her disability; (2) she requested accommodations or assistance for her disability; (3) [Defendants] did not make a good faith effort to assist her in seeking accommodations; and (4) she could have been reasonably accommodated but for [Defendants'] lack of good faith."  *Serine*, 2015 WL 803108, at *3 (quoting *Taylor*, 184 F.3d at 319-320). "'Once a qualified individual with a disability has requested...a reasonable accommodation, the employer must make a reasonable effort to determine the appropriate accommodation.  The appropriate reasonable accommodation is best determined through a flexible, interactive process that involves both the employer and the [employee] with the disability.'"  *Williams*, 380 F.3d at 771 (quoting *Jones v. United Parcel Serv.*, 214 F.3d 402, 407 (3d Cir. 2000).

From the facts alleged, there is no dispute that Defendants were aware of Plaintiff's disability and Plaintiff submitted requests for accommodations.  The question the Court must then decide is if there are disputed material facts surrounding whether Plaintiff and Defendants' good faith participation in the interactive process.  Having reviewed Plaintiff's emails to her

employers, the depositions of Plaintiff and her colleagues, and Plaintiff's affidavit[4], it is clear

disputes over material facts exist.

_____

[4] Presently before this Court is Defendants' Motion to Strike Plaintiff's Affidavit as a sham affidavit (ECF No. 51). Defendants claim Plaintiff's affidavit filed subsequent to her deposition testimony is a sham affidavit due to contradicting statements found in both her depositions and affidavit. Plaintiff responds that such statements are not contradictions but rather provide further explanatory answers. Accordingly, the Court denies Defendants' Motion to Strike.

"Under the 'sham affidavit' doctrine, courts may disregard an affidavit submitted in opposition to a motion for summary judgment 'when the affidavit contradicts the affiant's prior deposition testimony.'" *Amorosi v. Molino*, No. 06-5524, 2009 WL 737338, at *3 (E.D. Pa. March 19, 2009) (quoting *In re CitX Corp.*, 448 F.3d 672, 629 (3d Cir. 2006) (citation omitted)). "A sham affidavit cannot raise a genuine issue of fact because it is merely a variance from earlier deposition testimony, and therefore no reasonable jury could rely on it to find for the nonmovant." *Jiminez v. All American Rathskeller, Inc.*, 503 F.3d 247, 253 (3d Cir. 2007). "The main practical reason supporting the sham affidavit doctrine is that prior depositions are more reliable than affidavits." *Id.* The Third Circuit follows a flexible approach to the sham affidavit doctrine, pursuant to which courts should not disregard an affidavit when it is supported by independent evidence or there is a reasonable explanation for any inconsistency. *Celluci v. RBS Citizens, N.A.*, 987 F. Supp. 2d 578, 583 n. 2 (E.D. Pa. Dec. 17, 2013).

Defendants first alleged contradiction is over whether Plaintiff discussed increasing her fifty (50) pound lifting restriction to fifty-five (55) pounds with her doctor. Defendants' Mot. to Strike, ECF No. 51, 3. Plaintiff responds that her affidavit does not contradict her earlier deposition testimony but explains that Plaintiff did not ask about this weight restriction because she had discussed it with her doctor on prior occasions. The Court agrees with Plaintiff's explanation. Plaintiff's Response in Opposition, ECF No. 52, 11. In Plaintiff's Deposition testimony, when discussing her requested accommodations from mid-October 2017, Plaintiff stated that, once she was told about her department's ability to accommodate a fifty-five-pound weight limitation, she did not return to her doctor to ask if he would increase her weight restriction. Plaintiff's Depo., Attached to Plaintiff's Response to Defendants' Mot. to Strike as Ex. A [hereinafter Mot. to Strike Ex. A], 74:20-23. Similarly, in Plaintiff's deposition testimony from her worker's compensation case, when Plaintiff was asked if she ever spoke to her doctor about the five (5) pound weight restriction increase, Plaintiff stated that she knew she would be unable to work with a fifty-five (55) pound accommodation, but when she tried to explain why, opposing counsel cut her off. Worker's Compensation Dep., Attached to Plaintiff's Response to Defendants' Mot. to Strike as Ex. C [hereinafter Mot. to Strike Ex. C], 37:18-38:4. In Plaintiff's affidavit, she states that the reason she never spoke with her doctor about increasing the weight restriction to fifty-five-pounds is because her doctor did not believe working on-call was in her best interest. Plaintiff's Affidavit, Attached to Plaintiff's Response to Defendants' Mot. to Strike as Ex. B [hereinafter Mot. to Strike Ex. B], ¶¶ 5-6. Plaintiff's statement is not a direct contradiction but rather purports to explain why Plaintiff did not go back and speak to her doctor.

Defendants argue that they met their obligation under the ADA and were continually working to address Plaintiff's requested accommodation.  More specifically, Defendants claim they accommodated Plaintiff's medical concerns on numerous occasions, and management worked to make sure there they had all the necessary information about Plaintiff's position to seriously consider alternative accommodations for Plaintiff.  Mot. 15-16.  Defendants further state it was Plaintiff, not Defendants, who caused the breakdown of the interactive process when she admittedly refused to return to her medical provider to see if he would grant a five (5) pound weight increase of Plaintiff's weight restriction so that she could physically perform the functions of working in both the Outpatient and Hospital setting.  *Id*.  *See Collwell v. Rite Aid Corp.*, 602 F.3d 495, 507 (3d Cir. 2010) (Holding an employer cannot be faulted if the employee's acts or omissions cause the breakdown of the interactive process).  A reasonable jury could find that a five (5) pound weight increase was an appropriate request given that Plaintiff's

---

A second contradiction Defendants note is that, while in Plaintiff's affidavit, Plaintiff notes that her discussions with Defendants about her requested accommodations were not "interactive" (Ex. B at ¶¶ 10-11), Plaintiff's deposition testimony suggests that Defendants went back and forth with Plaintiff and that she was allowed to continue prior accommodations Defendants had granted her (Ex. A, 73:4-74:19, 77:12-13).  Though this may appear strong evidence to the contrary, Plaintiff's perception of the process as not being interactive does not directly contradict any statement made in her deposition testimony.

Defendants finally note that, despite Plaintiff's affidavit claiming Defendants told her to work without restrictions, Plaintiff admits in her deposition testimony that she was allowed to return to work with the accommodations of adjustable beds, sitting while performing procedures, and no pushing or pulling more than fifty-five (55) pounds.  Mot. to Strike 5.  Even though Defendants allowed Plaintiff to return with the previously mentioned accommodations, this does not contradict that Plaintiff could have been told on the telephone and in a September, 2017 letter that she would have to return to work without restriction.  *See* September  2017 Letter to Ms. Weiss, Attached to Ex. A as Exhibit 2 [hereinafter Ex. 2].

This Court finds no direct contradictions between Plaintiff's affidavit and either her deposition testimony from the present matter or from her worker's compensation claim.  Accordingly, Defendant's Motion to Strike Plaintiff's Affidavit is denied.

physician had previously granted a forty-five (45) pound increase within less than a ten (10) day period, and, at this point, Plaintiff had been undergoing months of therapy and treatment for her injuries.

Plaintiff responds to these allegations by explaining that she did not ask her doctor about the weight restriction increase at this time because they had already discussed them at length in deciding the fifty (50) pound restriction. Mot. to Strike Ex. B ¶ 6. Moreover, Plaintiff claims that if Defendants truly wanted to know about the five-pound increase, they could have asked her provider directly when they called him/her to inquire about the length of the requested accommodations. SUF ¶ 60; RSUF ¶ 60.

A reasonable jury could also find that Defendants did not act in good faith and were ultimately responsible for the breakdown of the interactive process. Plaintiff claims that Defendants were responsible for the breakdown of the interactive process and alleges that, no matter how long Plaintiff required the requested accommodation, Defendants would deny it. Plaintiff cites to an email written by Ms. Heffner just four (4) minutes after being made aware of Plaintiff's specific accommodation requests. Ms. Heffner determined that Plaintiff's request would "create an undue burden," even before she knew how long Plaintiff required the accommodations or spoke to anyone in the echo tech department. Ex. 5. Additionally, Plaintiff states that, on at least two occasions, she was told to not return to work if she had to return with restrictions. Pl's Response in Opposition 25.

Considering these facts, a reasonable jury could conclude that either Defendants or Plaintiff violated the duty to engage in good faith with the interactive process. Though the burden would now typically shift to Defendants in a *McDonnell Douglas* analysis, because there

are so many disputed material facts still in issue, it is appropriate for this Court to deny summary judgment by considering Plaintiff's prima facie case alone.

### C.   Plaintiff's Retaliation Claim

Under the *McDonnell Douglas* burden shifting framework, Plaintiff must establish a prima facie case of retaliation under the ADA by showing: (1) "'protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action.'" *Williams*, 380 F.3d at 759 (quoting *Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 567-568 (3d Cir. 2002) (citation omitted)). "[A] causal connection may be show by '(1) an unusually suggestive temporal proximity between the protected activity and the alleged retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link.'" *Gera v. County of Schuylkill*, 617 Fed. App'x 144, 147 (3d Cir. 2015). Plaintiff's allegation of retaliation is based upon Defendants' failure to provide Plaintiff with her requested reasonable accommodation of working entirely in Outpatient and taking a limited on-call schedule as she had done previously. Defendants dispute that this claim is meritless because it is not based upon a protected activity. The Court agrees with the Defendants.

This District has routinely held that, where Plaintiff's retaliation claim is based upon a failure to accommodate theory, it is meritless. As noted by the District Court in *Williams*, "[i]n essence, the plaintiff makes the circular argument that [Defendants] denied [her request to work entirely in Outpatient and with a limited call schedule] in retaliation for [her requesting this accommodation.]" *Williams v. Phila. Hous. Auth.*, 230 F. Supp. 2d 631, 639 (E.D. Pa. Oct. 28, 2002). *See also, Garner*, 63 F. Supp. 3d at 500 ("[Plaintiff's] retaliation claim is based entirely upon his failure to accommodate claim, and it cannot be presented as a separate claim."). Even

assuming that denying Plaintiff's request for reasonable accommodation constitutes an adverse employment action, Plaintiff still fails to establish a retaliation claim by not showing a causal connection between the protected activity and the adverse employment action.

For these reasons, this Court grants summary judgment in favor of Defendants on any retaliation claims.

### D.  Plaintiff's Entitlement to Recover Punitive Damages

Defendants finally argue that Plaintiff is not entitled to recover punitive damages because they "have made every effort to reasonably accommodate Plaintiff.  Mot. 26.  In response, Plaintiff suggests that this is a premature determination as there are still issues of material facts surrounding Defendants' accommodations.  Plaintiff's Response in Opposition 37.  For the reasons stated herein, the Court agrees with Plaintiff.

"Punitive damages are limited…to cases in which the employer has engaged in intentional discrimination and has done so 'with malice or with reckless indifference to the federally protected rights of an aggrieved individual.'"  *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 529-530 (1999) (quoting Rev. Stat. § 1977, as amended, 42 U.S.C. § 1981a(b)(1)).  Courts are only authorized to award punitive damages in cases where there is intentional discrimination. *Id*. at 534.  Intentional discrimination requires Defendants to act "'with malice or with reckless indifference to the federally protected rights of an aggrieved individual.'"  *Id*. (quoting 42 U.S.C. § 1981a(b)(1)).  "'Malice' and 'reckless indifference,' in this context, however, refer not to the egregiousness of the [employer's] conduct, but rather to the [employer's] knowledge that it may be acting in violation of federal law." *Alexander v. Riga*, 208 F.3d 419, 430 (3d Cir. 2000) (quoting *Kolstad*, 527 U.S., at 535).

Determining Defendants' mental state would require this Court to make credibility determinations about the deposition testimonies. The Third Circuit has long held that issues involving state of mind and credibility determination are not well suited by disposition at summary judgment. *See Watts v. Univ. of Del.*, 622 F.2d 47, 52 (3d Cir. 1980).

Accordingly, Defendants' Motion for Summary Judgment as to preclude Plaintiff from recovering any punitive damages is denied.

## V.    CONCLUSION

Because Plaintiff presents significant disputes of material fact as to her discrimination claim and her ability to recover punitive damages but fails to present a retaliation claim based on any argument other than a failure to accommodate theory, Defendants' Motion for Summary Judgment is denied in part and granted in part.

An appropriate Order follows.

BY THE COURT:


*/s/ C. Darnell Jones, II*
C. DARNELL JONES, II    J.